Lorelei Lee RICE, Appellant,

v.

The STATE of Oklahoma, Appellee.

No. F–76–804.

Court of Criminal Appeals of Oklahoma.

Aug. 1, 1977.

Mandy Welch, Hugo, for appellant.

Larry Derryberry, Atty. Gen., Robert L. McDonald, Asst. Atty. Gen., Duane N. Rasmussen, Legal Intern, for appellee.

## OPINION

BRETT, Judge.

Appellant, Lorelei Lee Rice, hereinafter referred to as defendant, was charged in the District Court, Choctaw County, Case No. CRF–75–54, with the offense of Murder in the Second Degree, in violation of 21 O.S.Supp.1973, § 701.2. The case was tried to a jury, and a verdict of guilty of First Degree Manslaughter was returned. Punishment was assessed at twelve (12) years' imprisonment. From said judgment and sentence a timely appeal has been perfected to this Court.

Elmer C. Chesier, night patrolman for the town of Boswell, Oklahoma, stated that he knew the defendant, and that at about midnight on August 2, 1975, he spoke with her. She told him that her husband, Charles Rice, was drunk and had gone after their children in an automobile. The defendant asked the witness to go after her husband and get the car and children away from him. The witness and Marshall Battiest drove a short distance west of Boswell, and observed Mr. Rice and his children proceeding towards Boswell. The witness turned

around and stopped Mr. Rice near Boswell City Hall. The car and children were turned over to the defendant, and Mr. Rice was driven to his mother's house. An hour later defendant returned to Boswell and met the witness, telling him "he came back home and done just what I said he would do." She also stated that she was going after him. One half hour later the defendant came back again, jumped out of her car with a shotgun in her hand, and ran toward the witness screaming, "Well, I killed him." On cross-examination the witness stated that on the same night he removed Jo Gage from an American Legion dance because she was drunk. Deceased was killed later that evening at the Gage home.

Boswell City Marshal, Alto Battiest, gave testimony corroborative in large part of the previous witness' testimony. He also stated that he investigated the scene of the shooting, finding the deceased lying partly on a mattress in the living room with a wound in his chest. He appeared to be dead at the time.

Josephine Gage stated that she was removed from the American Legion dance by Chesier, and that when she arrived home she put her children to bed. In the dark a match was heard striking, whereupon the deceased's presence in her house manifested itself. The witness asked Mr. Rice what he was doing, and he replied that his wife had run him off. He then sat on a mattress on the floor and asked for a drink of water. The witness then observed the barrel of a gun protruding through an open window, heard a voice say, "Charles, lookie here," and then the gun was fired, striking deceased. The witness went outside and saw the defendant with a shotgun. On cross-examination the witness admitted that she had been drinking heavily all day.

Gene Gage, 9-year-old son of the previous witness, corroborated his mother's testimony.

Roylia Akins, employed with the Choctaw County Sheriff's Office, reproduced a drawing of the crime scene.

The next witness called was Dr. Prosser, a psychiatrist, who gave testimony tending to establish defendant's insanity defense. This witness was called out of turn.

Merlyn Bellamy, qualified as a pathologist, was the next witness for the State, and testified that the deceased died from a shotgun wound to the chest. The State then rested.

Defendant spoke on her own behalf. She testified that her husband was an alcoholic, and that he beat her regularly, often in front of others. At times she was forced to sit in his company at the point of a gun. She had filed for divorce three times, but had always decided to give him another chance. She was 28 years of age, had three young children, and had been married to her husband since 1966. Her education was complete to the ninth grade. Concerning the events surrounding the homicide, she stated that on August 2, 1975, her husband began drinking early in the day. Later the same evening at approximately 9:00 p.m., defendant and her husband went to a bar in Boswell called Lonzo's. As they started to leave around 11:30 or 12:00 that night, they got into an argument over who should drive. Charles had been drinking and defendant felt it would be safer if she drove. Defendant finally gave her husband the keys, called her mother, and asked her to pick her up. Defendant then went to the City Hall and asked the night watchman, Elmer Chesier, and the City Marshal, Alto Battiest, to go to her mother-in-law's house and ask her not to let Charles have the children because he had been drinking. The two men got the car and the children from Charles. Defendant took the children home in the car and they went to bed. Charles was taken to his mother's house, as testified to by Chesier. Some time later after defendant had fallen asleep, she awoke when Charles grabbed her throat and dragged her out of bed. Defendant gave her husband the keys to the car and he left. Defendant then dressed, borrowed her grandfather's car and went looking for her husband. She took a gun with her because she knew that Charles carried a gun. Defendant found Charles' car parked outside of Josephine Gage's house. She stopped,

got out of the car, and went up to the door but it was locked so she went to a window. She saw Charles sitting on a mattress beside Josephine Gage. Defendant called Charles twice. The second time he looked at her and started to the window. Then, according to defendant's testimony, "that is when I shot him." She turned around and ran. She testified that she did not know if she had shot Charles, and that she was afraid he would take the gun away from her and use it on her. After allegedly running down the street and standing by a tree for awhile, she returned, went inside the house, and saw that Charles was dying. She then went to the City Hall.

Defendant then presented several witnesses who verified accounts of beatings which defendant had related. These witnesses also attempted to testify as to defendant's reputation, but their testimony was limited by several rulings of the court. The defense rested with the State presenting no rebuttal witnesses.

■ In her first assignment of error defendant complains of the submission to the jury of Instruction No. 11, which is reflected in the record as follows:

"On the trial of a person charged with murder, the commission of homicide by the defendant being proven or admitted, the burden of proving circumstances of mitigation, or that justify or excuse it, devolves upon the defendant, unless the proof on the part of the prosecution shows [that] the crime committed amounted only to manslaughter, or that the defendant was justifiable or excusable."

In *Pettigrew v. State*, Okl.Cr., 554 P.2d 1186 (1976), we held that the giving of this instruction over the objection of the defendant constituted reversible error, for it had the effect of shifting the burden of proof to the defendant. Herein the record does not reflect that defendant made any objection to this instruction. The trial transcript ends with the conclusion of the defendant's evidence, and does not reflect either closing arguments of counsel or the proceedings surrounding the giving of instructions. On March 28, 1977, this Court issued an order to supplement the record in order to determine whether objections were made. On May 3, 1977, a hearing was held wherein defendant's trial attorneys gave testimony. Neither they nor the trial judge was able to state that objections had in fact been taken to court's instruction No. 11, or to any other instruction. This Court has often stated that if defense counsel objects to proposed instructions said objections should be affirmatively noted in the record. When this is not done the objection is deemed to have been waived. *Mathes v. State*, Okl.Cr., 552 P.2d 415 (1976); *Wyatt v. State*, Okl.Cr., 491 P.2d 1098 (1971). Defendant's first assignment of error is therefore without merit.

■ Defendant's second assignment of error concerns the trial court's refusal to allow three defense witnesses to testify to defendant's good reputation for being a peaceable and law abiding citizen. Each witness was asked if he knew defendant and if so for how long. Each witness was then asked if he knew defendant's reputation for being a peaceable and law abiding citizen. Each witness stated, or would have stated had the State's objections not been sustained, that he knew defendant's reputation, and it was good. The court sustained the State's objections and refused to allow the testimony on the grounds that a proper foundation had not been laid, inasmuch as each witness stated that he had not discussed defendant's reputation with anyone in the community. *Phillips v. State*, 20 Okl.Cr. 415, 203 P. 902 (1922), concerned the issue of a witness' reputation for truth and veracity. There, the trial court instructed the jury to disregard the testimony of another witness who stated that the first witness' reputation was bad. This was done because the second witness stated on cross-examination that he had discussed the first witness' reputation with only one person. In reversing the conviction, this Court stated:

". . . The rule is well established that where a witness testifies that he knows the general reputation of a wit-

ness for a particular trait of character, he may then be permitted to state what that reputation is, provided it relates to the time of the offense and residence of the witness whose reputation is attacked. *Ward v. State,* 15 Okl.Cr. 150, 175 P. 557, and cases therein cited.

"Nor do we believe a witness is rendered incompetent to testify as to general reputation because he cannot say that he has heard a majority of persons of any community, nor even any definite number of them, discuss that reputation. . . .

"So that the courts have generally adopted the rule that as to knowledge of such general reputation the question must be referred largely to the conscience of the witness who testifies; that the witness must answer on his own responsibility and is then subject to cross-examination as to the source, extent, and correctness of his information as to the matter which he testifies. Whether the witness is sufficiently informed to give a general opinion arrived at from the general concurrence in the view which he expresses, we think, is a question for the jury to determine. The fact that such witness testifies that he knows such general reputation is a sufficient predicate to permit the expression of his opinion thereon. . ."

■ There remains to be considered the effect this had upon the jury. We are of the opinion that this was not reversible error. It is well recognized that evidence of a defendant's good character serves two purposes: First, that defendant's good character makes it improbable that defendant committed the crime charged; and second, for purposes of mitigation. See, *Sinquefield v. State,* 49 Okl.Cr. 300, 294 P. 203 (1930). In the present case we have no doubt that defendant's actions at the time of the homicide did not constitute self-defense. Defendant was in no way threatened at the time she obtained the gun. She drove around for some considerable length of time looking for her husband. When the fatal shot was fired, the evidence indicates that deceased was sitting down inside a house. Defendant fired the gun through an

open window. This Court is of the opinion that upon retrial of this case a manslaughter verdict would again be returned. Furthermore, defendant's defense of insanity was in no way connected with defendant's character witnesses.

■ This Court cannot conscientiously say, however, that the trial court's refusal to allow the jury to consider defendant's character witnesses' testimony had no effect upon the sentence assessed. For this reason, a modification of sentence is in order.

Defendant's third and fourth assignments of error again concern alleged error of the trial court in giving, and failing to give, specified instructions. We need only note that the record fails to reflect that defense counsel took objections to the instructions given, or that defense counsel requested the instruction which was not given. This being so, then any error was waived. *Mathes v. State,* supra.

■ Defendant's fifth assignment of error is that the trial court erred in refusing to give defendant's requested instructions Nos. 11 and 13. Defendant's requested instruction No. 11 states:

"You are instructed that communicated threats are admissible in evidence for the purpose of showing the defendant's state of mind toward the deceased at the time of the homicide, and also to show the fact and reasonableness of defendant's apprehension of violence at the hands of the deceased."

Defendant's requested instruction No. 13 states:

"You are instructed that threats to kill the defendant made by the deceased may create reasonable apprehension of danger in the mind of the defendant."

We are of the opinion that the court's instruction No. 20 sufficiently covered the area of law for which defendant's instructions Nos. 11 and 13 were submitted. Court's instruction No. 20 states:

"If you believe and find from the evidence that the defendant had received

information that the deceased had, prior to the difficulty in which he lost life, made threats of a violent nature toward and about the defendant, then you may take such fact into consideration in connection with all the other facts and circumstances in the case in determining whether or not the defendant honestly and in good faith believed her life was in danger, or that she was in danger of receiving great bodily injury at the hands of the deceased, and whether or not the defendant honestly and in good faith acted under the influence of such belief at the time she took the life of the deceased."

■ This Court has often stated that instructions are to be considered as a whole, and when they fairly and accurately state the applicable law they will be deemed sufficient. It is not error to refuse to give requested instructions when the substance of the requested instruction is contained in instructions actually given. See, *Buchanan v. State*, Okl.Cr., 512 P.2d 1382 (1973). Defendant's fifth assignment of error is therefore lacking in merit.

■ Defendant's sixth assignment of error is that the trial court erred in refusing to allow defendant's witnesses Harold Roberson and Glenda Endsey to testify concerning specific acts of violence toward defendant by the deceased. Defendant asserts two propositions, the first arising out of the following testimony of Roberson:

"Q. Did you ever see Bonnie and Charles have a fight or argument?

"A. Yes, sir.

"Q. When was this?

"A. About three or four years ago.

"Q. Where did this take place?

"A. The nightclub here south of Hugo.

"Q. Just tell the Jury what happened.

"A. Well, I don't know exactly what happened. I don't know what the argument was about, but he hit her and her jaw was locked open.

"BY MR. BROCK: Your Honor, I object to that last response and ask that it be stricken.

"BY THE COURT: The objection will be sustained and the Jury will disregard the last statement of this witness."

Defendant asserts that the trial court erred in sustaining the State's objection inasmuch as evidence of violent acts of deceased toward the defendant were material to her defenses of self-defense and insanity. We are of the opinion that this was not error. The event in question occurred in a club. The witness stated, "Well, I don't know exactly what happened. . . ." The State objected, apparently taking the view that the witness was testifying to something to which he did not have personal knowledge. The court, rightfully or wrongfully, sustained the State's objection. Defendant thereupon took no exception to the court's ruling. An exception here would have been no mere formality for by not taking it defendant apparently acquiesced in the court's ruling. Had an exception been taken argument could have been had with the chance of changing the court's mind. Since the exception was not taken, the trial court was denied an opportunity to correct itself. A prosecutor's objection to evidence introduced by the defendant does not preserve the record for defendant when the court rules adversely to defendant. See, *Henderson v. State*, Okl. Cr., 385 P.2d 930 (1963).

■ Defendant similarly complains of the following during examination of the witness Endsey:

"Q. Have you ever seen Bonnie and Charles get into any type of fight or argument?

"A. Yes.

"Q. When was this?

"A. Well, I couldn't tell you when it was.

"Q. Where was it?

"A. At her house.

"Q. Tell the Jury what happened?

"A. Well, I don't know how it started, but he started hitting her he starting (sic) going outside and he started. beating on that dog afterwards.

"BY MR. BROCK: We object to that last voluntary statement and ask that it be stricken.

"BY THE COURT: The objection will be sustained. The last statement will be stricken from the record and the Jury will be instructed to disregard it.

"BY MR. STAMPER: Note our exception.

"BY MR. BURRAGE:

"Q. What did he do after he stopped beating her?

"A. He went outside.

"Q. Did you see what he did outside?

"BY MR. BROCK: Objection.

"BY THE COURT: The objection will be sustained."

Defendant again asserts that defendant was prevented by the court's ruling from introducing evidence concerning acts of violence perpetrated upon defendant by deceased. However, we are of the opinion that the court sustained an objection to only the last voluntary statement concerning the fact that deceased beat a dog, which was irrelevant. That this is so can be seen from the next series of questions wherein defense counsel assumed the beating to be true. Had the prosecutor objected to the witness' testimony concerning the beating of defendant another objection would have been forthcoming. It was only to what deceased "did outside," i. e., beat the dog, to which the State's objections were directed. Thus, the court did not improperly prevent defendant from introducing evidence concerning acts of violence by deceased upon defendant. The sixth assignment of error is without merit.

 Defendant's seventh assignment of error is that the trial court erred in failing to instruct on manslaughter in the second degree, and on excusable homicide. This is so, defendant contends because the evidence adduced at trial was consistent with negligent or accidental homicide. However, as we review the record there was no evidence whatsoever that the defendant either accidentally or negligently shot her husband. Defendant stated that she did not remember shooting the deceased. The State's evidence showed that the deceased was sitting on a mattress in a house when a gun protruded through a window and discharged. The person who was with deceased then went outside and observed the defendant; there being no evidence of culpable negligence or accident, it was not error to fail to give instructions on manslaughter in the second degree, and excusable homicide. See, *Johnson v. State,* Okl.Cr., 506 P.2d 963 (1973). See also, *Miller v. State,* Okl.Cr., 523 P.2d 1118 (1974).

Defendant's final assignment of error is that the punishment was excessive. We agree, because of error of the trial court in refusing to allow defendant's character witnesses to testify to defendant's good reputation. See, *Sinquefield v. State,* supra. Defendant's sentence will therefore be modified from twelve (12) years' imprisonment to four (4) years' imprisonment.

For the foregoing reasons and for the reason that the facts of this case are similar to those found in *Vassaur v. State,* Okl.Cr., 514 P.2d 673 (1973), wherein that defendant was physically abused by her husband, and she was sentenced to serve four years' imprisonment on a conviction of manslaughter, the judgment and sentence in the instant case shall be modified to four (4) years' imprisonment; and, as *MODIFIED* the judgment and sentence is *AFFIRMED.*

 Notwithstanding the fact that the trial court denied defendant's request for suspension of her sentence, defense counsel is admonished to consider the provisions of 22 O.S.1971, § 994, and to again apply for a suspended sentence under those provisions. Considering the total facts of the instant case, defendant's educational background, and the fact that she has not heretofore been convicted for a serious offense, coupled with the crowded conditions existent at the State penitentiary, it appears that the proper administration of justice provides for further consideration of this defendant's cause.

BUSSEY, P. J., concurs.